IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

    *Plaintiff*,

    v.

MONTRAY GROSS,

    *Defendant*.

Criminal Nos. ELH-16-0522
ELH-10-0176

**MEMORANDUM OPINION**

Montray Gross is a defendant in two federal cases: ELH-10-0176 ("*Gross I*") and ELH-16-0522 ("*Gross II*"). Gross, who is serving a 78-month sentence at FCI Hazelton, submitted correspondence on June 5, 2020, docketed in *Gross I*, construed as a motion for compassionate release. *See Gross I*, ECF 66.[1] Thereafter, through counsel, he filed in *Gross II* an "Emergency Motion For Compassionate Release And Modifying Sentence Pursuant To 18 U.S.C. § 3582(c)(1)(A)(i)." *Gross II*, ECF 55 (the "Motion"). The Motion is supported by several exhibits. The government opposes the Motion. *Gross II*, ECF 65. And, it submitted an exhibit. Defendant has replied. ECF 67.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.[2]

---

[1] *Gross I* was originally assigned to Judge J. Frederick Motz, who has since retired. The case was reassigned to me on August 28, 2017, due to Judge Motz's retirement. As discussed, *infra*, the defendant has served his sentence in *Gross I*.

[2] This Memorandum Opinion does not resolve the motion to vacate filed by defendant on June 9, 2020, in *Gross I*, ECF 69, and in *Gross II*, ECF 48.

## I. Background

On November 1, 2016, in *Gross II*, a grand jury in the District of Maryland returned an indictment against defendant (ECF 1), charging him as a convicted felon with one count of unlawful possession of a firearm and ammunition on July 9, 2016 (Count One) and unlawful possession of ammunition (Count Two).

At the time of the offense in *Gross II*, the defendant was on supervised release in *Gross I*. In that case, he had pleaded guilty on January 12, 2011 (ECF 25) to the offense of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Judge Motz sentenced Gross on March 31, 2011, to a term of 77 months' incarceration, concurrent with sentences the defendant was serving in the State system. ECF 34; ECF 36. The sentence was subsequently reduced to 63 months. ECF 39. The Court also set a period of supervised release of three years.

Gross entered a plea of guilty to Count Two in *Gross II* on July 24, 2017 (ECF 36), pursuant to a Plea Agreement. ECF 37. The plea was entered under Rule 11(c)(1)(C), by which the parties agreed to a sentence of 78 months' imprisonment. *Id.* ¶ 8. The parties contemplated a final offense level of 25 pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). ECF 37, ¶ 6(c).

The Plea Agreement included a stipulation of facts. *Id.* ¶ 6(a). According to the stipulation, on July 9, 2016, members of the Ocean City Maryland Police Department ("OCPD") responded to a report of a possible robbery near the Tidelands Hotel. The two juvenile victims provided law enforcement with a description of the assailant. Members of the OCPD saw the defendant, who matched the description of the robbery suspect, and stopped him as he entered a vehicle. The robbery victims identified the defendant as the robber.

Thereafter, an OCPD officer recovered from the vehicle property that had been reported stolen by the victims.  The officer arrested the defendant and searched him.  During that search, the officer recovered from the defendant one Herters .380 caliber cartridge, one Winchester 9mm Luger cartridge, and one Remington, .380 caliber cartridge.  The police then looked inside the vehicle and recovered from under the front passenger seat a Kimber, Micro Carry STS, .380 caliber semi-automatic pistol, loaded with three rounds of .380 caliber cartridges.

Following the defendant's arrest, OCPD sent the items recovered from the defendant for forensic examination.  The analysis revealed that the last of the three rounds of .380 caliber magazine loaded into the Kimber, Micro Carry STS, .380 caliber semi-automatic pistol, serial number T0001437, contained the defendant's DNA.

Sentencing in *Gross II* was held on September 15, 2017.  ECF 42.  According to the Presentence Investigation Report ("PSR," ECF 41), Gross was then 32 years old.  *Id.* at 3.  The PSR did not reference defendant's asthma.  *See id.* ¶ 19.

The defendant had a final offense level of 25 for the unlawful possession of ammunition. *Id.* ¶ 25.  According to the PSR, Gross has an extensive criminal history, with 22 criminal history points.  *Id.* ¶¶ 37, 38.  This gave rise to a criminal history category of VI.  *Id.* 39.  His Guidelines called for a sentence ranging between 110 and 120 months of imprisonment.  *Id.* ¶ 72.[3]  But, the Court imposed a sentence of 78 months, with credit from July 9, 2016.  ECF 44.

With respect to *Gross I*, the violation of supervised release was heard on September 15, 2017.  ECF 59.  The Court sentenced the defendant to 12 months of incarceration, concurrent with the sentence in *Gross II*.  ECF 60.  Therefore, the defendant has completed his sentence in *Gross*

---

[3] The Guidelines were actually 110 to 137 months.  But, because the Guidelines cannot exceed the statutory maximum (here, 120 months), the Guidelines were revised.  *See* U.S.S.G. § 5G1.1(c)(1).

*I.*

The defendant is currently incarcerated at FCI Hazelton in West Virginia.  ECF 55-3; ECF 55-4.  He has served over 75% of his sentence in Gross *II* (ECF 55 at 2) and has a projected release date of January 19, 2022.   *See Find an Inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited December 9, 2020).

Gross made two requests for compassionate release to the Warden of FCI Hazelton, both of which were denied.  ECF 55-3; ECF 55-4.  Gross, who is now 35 years of age, seeks release from the Court based on his asthma, coupled with the COVID-19 pandemic.  *See* ECF 55 at 2, 7-11.  He asserts that he is "at a unique risk [to COVID-19] due to his well-documented asthma." *Id.* at 10.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).   One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v.*

*Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, ___ F.3d ___, 2020 WL 7050097, at *2 (4th Cir. Dec. 2, 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 2020 WL 7050097, at *3.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction;

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses

5

for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 2020 WL 7050097, at *3. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy,* 2020 WL 7050097, at *3. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy,* 2020 WL 7050097, at *3. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are more expansive than § 1B1.13. They

indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D).

Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>> (I) suffering from a serious physical or medical condition,
>>
>> (II) suffering from a serious functional or cognitive impairment, or
>>
>> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the

reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 2020 WL 7050097, at *3.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 2020 WL 7050097, at *3 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at *7; *see also United States v. Zullo*, 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, __ F.3d __, 2020 WL 6817488, at *1–2 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, __ F.3d __, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts

need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 2020 WL 7050097, at *8. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 2020 WL 7050097, at *9 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, ___ Fed. App'x ___, 2020 WL 6743609, at *2 (4th Cir. Nov. 17, 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[4]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130,

---

[4] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[5]  The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  Moreover, although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted).  As of December 9, 2020, COVID-19 has infected nearly 15.3 million Americans and caused over 287,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Dec. 9, 2020).

The COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need

---

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

no elaboration."). The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393, (6th Cir. 2020). Indeed, for a significant period of time, life as we have known it came to a halt. Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

Currently, no vaccine, cure, or proven treatment is available. But, a vaccine is on the horizon. Indeed, other countries have already begun innoculations.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that increase the chance of severe illness. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020 and July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; smoking; pregnancy; and Type 2 diabetes. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at

11

highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

The CDC has also created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  Social distancing is particularly difficult in the penal setting, however.  *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the

Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the Bureau of Prisons ("BOP") from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

13

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, however, the virus persists in penal institutions.[6]  As of December 8, 2020, the BOP had 124,616 federal inmates and 36,000 staff.  And, as of the same date, the BOP reported that 6,440 inmates and 1,647 BOP staff currently tested positive for COVID-19; 22,724 inmates and 2,142 staff have recovered from the virus; and 153 inmates and two staff members have died from the virus.  Moreover, the BOP has completed 84,267 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/ (last accessed Dec. 8, 2020).  *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

With respect to FCI Hazelton, where the defendant is a prisoner, as of December 8, 2020, the BOP reported that three inmates and four staff have tested positive for COVID-19 and five

---

[6] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.  *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

inmates and 16 staff have recovered at the facility. And, the facility has completed 449 tests. There have been no reported deaths. *See* https://www.bop.gov/coronavirus/ (last accessed Dec. 8, 2020).

## IV. Discussion

Gross has moved for compassionate release on the ground that his asthma renders him particularly vulnerable to COVID-19. *See* ECF 55 at 2, 7-11. He asserts that his "long-term condition" is "well documented." *Id.* at 8. As the defendant notes, the medical records he submitted (ECF 57) establish that he is prescribed two medications for his asthma, which "serve . . . different purposes." ECF 55 at 8.

According to Gross, one of the medications he is prescribed, Albuterol, "is a quick-relief medication, taken only when the patient is suffering from an acute asthma attack." ECF 67 at 10. The second medication, Mometasone, is a corticosteroid and "is not prescribed to provide quick relief for acute asthma attacks, but to control chronic asthma." *Id.* However, the defendant asserts that Mometasone "causes him to suffer from nausea and vomiting." *Id.*; *see* ECF 55 at 10. He adds that although "he has requested an alternative medication to *control* his asthma . . . he has not been provided one." ECF 67 at 10 (emphasis in original); *see* ECF 55 at 10.

The government disputes that the defendant's asthma constitutes an extraordinary and compelling reason for compassionate release. ECF 65 at 15. As to the defendant's assertion regarding Mometasone, the government notes that a medical record indicates that the defendant "does not use [Mometasone] because he does not like it." *Id.* (citing ECF 65-1 at 8).

I agree with the government that Gross has not carried his burden of demonstrating that his asthma renders him sufficiently vulnerable to COVID-19 to warrant a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). The defendant's medical records reflect that he has asthma, for which he is prescribed medication. *See, e.g.*, ECF 57; ECF 65-1 at 8, 9, 18, 25.

However, the references to asthma in the medical records are not illuminating. In particular, the medical records do not establish how, if at all, asthma has any impact on the defendant's daily life. Indeed, Gross does not concretely assert that there is any such impact. And, the PSR does not contain any reference to asthma in the section on "Physical Condition." *See* ECF 41, ¶ 19.

As mentioned, the CDC classifies asthma as a condition that "might" increase the risk of complications due to COVID-19. Absent evidence of other (and current) underlying conditions that make Gross particularly vulnerable to COVID-19, or evidence concerning the severity of his asthma, the evidence before me does not establish grounds for compassionate release.

This conclusion aligns with the decision of numerous courts to deny compassionate release where the defendant has claimed mild asthma as his or her only medical condition. *See United States v. Bailey*, CCB-14-146, 2020 WL 4366340, at *2 (D. Md. July 30, 2020) (declining to grant compassionate release solely on the basis of asthma); *United States v. Wilson*, 2020 WL 4287592, at *4 (S.D. W.Va. July 27, 2020) ("mild intermittent asthma" was not a compelling reason to grant compassionate release); *see also, e.g.*, *United States v. Wheeler*, No. 19-cr-00085 (ESH), 2020 WL 2801289, at *3 (D.D.C. May 29, 2020); *United States v. Perez*, No. 15-cr-2874-BAS-1, 2020 WL 3639739, at *4 (S.D. Cal. July 6, 2020); *United States v. Slone*, Cr. No. 16-400, 2020 WL 3542196, (E.D. Pa. June 30, 2020); *United States v. Anguiera*, No. 11-CR-116S (1), 2020 WL 3424530, at *5 (W.D.N.Y. June 23, 2020); *United States v. Mascuzzio*, No. 16-cr-576 (JFK), 2020 WL 3050549, at *3 (S.D.N.Y. June 8, 2020); *United v. Miller*, No. 18-cr-30034, 2020 WL 2093370, at *3 (C.D. Ill. May 1, 2020).

Because Gross has failed to provide an extraordinary and compelling reason for compassionate release, I need not address the relevant sentencing factors under 18 U.S.C. § 3553(a). Nevertheless, I note that a reduction of Gross's sentence to time-served would be

inconsistent with the § 3553(a) factors.

Gross's prior record is quite troubling.  As a juvenile, Gross was arrested seventeen times, beginning at age nine.  ECF 41, ¶ 27.  The defendant's first adult criminal conviction dates to 2007, when he was seventeen years old.  *Id.* ¶ 29.  He was sentenced for a fourth degree sex offense to 12 months' incarceration, with all but 130 days suspended (time served).  *Id.*  Thereafter, Gross violated probation.  *Id.*  At age 18, the defendant pleaded guilty to possession of marijuana with intent to distribute and to possession of a handgun.  *Id.* ¶ 30.  He was sentenced to two years' incarceration, of which eight months were suspended, followed by probation.  *Id.*  Thereafter, he violated his probation.  *Id.*  In 2003, he received a three-year sentence for a felony CDS offense. *Id.* ¶ 23.  Gross was convicted in 2007 of second degree assault and sentenced to 366 days' incarceration.  *Id.* ¶ 32.  On the same date, he pleaded guilty to possession of a controlled substance with intent to distribute, for which he received a sentence of five years' incarceration, with two years suspended, followed by probation.  *Id.* ¶ 33.  Again, he violated probation.  *Id.*  At age 24, the defendant pleaded guilty to theft of less than $1,000 and was sentenced to 18 months' incarceration.  *Id.* ¶ 35.  And, at age 25, he pleaded guilty to theft over $500, for which he was sentenced to seven years' incarceration, with five years suspended, followed by probation.  *Id.* ¶ 36.

Moreover, Gross is now serving his second federal sentence for a firearms offense.  The first federal sentence did not deter him; while on supervised release in *Gross I*, the defendant continued down the wrong path and committed the offense that led to his current sentence in *Gross II*.

To be sure, Gross appears to have engaged in the hard labor of rehabilitation: he has taken numerous educational and vocational courses while incarcerated, including "the Bounce-Back

Transition Program, a program focused on release preparation and self-improvement," which included "courses on communication, anger management, gaining control, and self-empowerment."  ECF 55 at 12; *see* ECF 55-7.  The Court applauds Gross for his effort.  And, as noted, Gross has served a significant portion of his sentence.  Nevertheless, considering all the factors under § 3553(a), they counsel against a reduction in sentence.

## V.  Conclusion

For the forgoing reasons, I shall deny the Motion (*Gross II*, ECF 55; *Gross I*, ECF 66), without prejudice.  This determination is not intended to have any bearing on a decision of the BOP concerning release on home confinement.

An Order follows, consistent with this Memorandum Opinion.


Date:   December 15, 2020                                        _____/s/_____

                                                                Ellen Lipton Hollander
                                                                United States District Judge

18